# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 04-612

CHARLES B. ASHY, SR.

VERSUS

WILLIAM E. TROTTER, II

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2003-0488
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE
**********

## GLENN B. GREMILLION
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Glenn B. Gremillion and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

Hal James Broussard
Ped C. Kay, III
Leslie A. Venable
Broussard & Kay
P. O. Drawer 3308
Lafayette, LA 70502
(337) 232-1666
Counsel for Plaintiff/Appellee
        Charles B. Ashy, Sr.

**John Daniel Rayburn, Jr.**
**P. O. Drawer 3308**
**Lafayette, LA 70502-3308**
**(337) 232-1666**
**Counsel for Plaintiff/Appellee**
**Charles B. Ashy, Sr.**

**Alan K. Breaud**
**Michael Gerard Lemoine**
**Breaud & Lemoine**
**P. O. Box 3448**
**Lafayette, LA 70502**
**(337) 266-2200**
**Counsel for Defendant/Appellant**
**William E. Trotter, II**

GREMILLION, Judge.

In this case, the defendants-appellants, William E. Trotter, II and William E. Trotter, II Family LLC, appeal the jury's finding that it breached its contract with the plaintiff-appellee, Charles B. Ashy. For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This case revolves around the ownership and sale of the Evangeline Downs race track located in Lafayette, Louisiana. Ashy and Trotter have a long business relationship dating back to 1968. Trotter and his business partner, Braxton I. Moody, III, first purchased the track in the late 1960's, which they sold in 1982. Trotter and Moody reacquired the track in early 1995, through their corporation, Old Evangeline Downs, Inc. (OED).

In 1995, Moody solicited Ashy to provide his services in connection with the operation and development of Evangeline Downs. Ashy continued operating the track through 1997, and claimed to have obtained an agreement with Trotter, documented in a January 10, 1998 letter, authorizing Ashy to receive 5% of the net sales price of the track in the event it was sold. In his petition, Ashy claimed that Trotter was in a business arrangement with Moody, in whom he had vested authority to act on his behalf and on behalf of their jointly owned entities and ventures.

In April 2002, significant ownership interests in Evangeline Downs was transferred to Peninsula Gaming, Inc. However, Trotter never paid Ashy his 5% interest as agreed to in the January 1998 letter. Ashy, thereafter, filed suit to recover his 5% interest.

1

In August 2003, Trotter filed a motion for summary judgment urging that there was no genuine issue of material fact that a contract did not exist between him or Trotter Family LLC and Ashy. The motion was denied and Trotter applied for a supervisory writ to this court, which was also denied. Following a trial on the merits, the jury concluded that Ashy met his burden of proving that Trotter agreed to pay him 5% from the net sale of Evangeline Downs and awarded him $750,000 for breach of contract. The jury found Trotter and Trotter Family LLC responsible for the amounts awarded. A judgment was rendered casting Trotter and Trotter Family LLC liable in solido to Ashy for $750,000, in addition to legal interest from the date of judicial demand. Trotter and Ashy now appeal.

## ISSUES

Trotter assigns as error the jury's finding that Ashy met his burden of proving that a contract existed between the two wherein Trotter would pay Ashy 5% of the net selling price of its interest in OED.

Ashy assigns as error:

1.  The trial court's failure to accept Steven A. Molnair as an expert and allow his testimony on anticipated future slot revenues to be heard by the jury.

2.  The trial court's failure to allow the jury to consider future slot revenues as a portion of the damages owed to Ashy based upon the information already in evidence and a discount rate chart.

3.  The trial court's failure to award him 5% of Trotter's net selling price received from the building and property of Evangeline Downs.

4.  The trial court's award of interest on the Judgment from date of judicial demand rather than from the date of the breach of contract.

**LAW**

Whether or not an oral contract has been confected between the parties is subject to the manifest error standard of review. *See Peter Vicari Gen. Contractor, Inc. v. St. Pierre*, 02-250 (La.App. 5 Cir. 10/16/02), 831 So.2d 296. Thus, pursuant to *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989):

> The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

Though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Id.* Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Stobart v. State Through DOTD,* 617 So.2d 880, 883 (La.1993). "The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id.* at 882.

Trotter argues that Moody had no actual or apparent authority to bind "the personal assets of Trotter L.L.C.," including its membership interests in Evangeline Downs. He argues that no oral contract existed, that Moody did not have the authority to bind him, and that as a matter of law pursuant to La.Civ.Code art. 1947 and *Carter v. Huber & Heard, Inc.*, 95-142 (La.App. 3 Cir. 5/31/95), 657 So.2d 409, *writ denied*, 95-1662 (La. 10/16/95), 661 So.2d 471, no contract was formed due to the failure of the parties to execute a signed, written agreement as

3

contemplated.

This case involves extensive testimonial and documentary evidence. At the heart of the matter is an unsigned January 10, 1998 document, which states:

Dear Charlie,

The following sets fourth [sic] our agreement with regard to your compensation package.

1. Salary for 1997 of $100,000 or 10% of pretax net income, adjusted for interest expense not to exceed interest on Banc One note and losses on Jam Fest except that bonus will not be less than $50,000.

2. Effective January 1, 1998 salary of $150,000 plus benefits or 10% of pretax net income whichever is greater. Pretax income is adjusted for actual interest expenses on bank loans not to exceed interest on Banc One notes and other such bank loans.

3. If at the time the slot parlor opens your salary will increase to $300,000 plus benefits or 5% of net income whichever is greater. Net Income is defined as total net income in accordance with generally accepted accounting principles. (Example, net income after taxes of $20 million @ 5% equals $1 million less $300,000 equals bonus of $700,000.

4. **If the company is sold or a strategic partner is brought in your [sic] would receive 5% of the net selling price**. (Example, if the company is sold for $50 million, you would receive $2.5 million from which, at your sole discretion, you would give Paul and Charles, Jr. a bonus.) If a third interest is sold for $14 million, you would receive $700,000 and your pay package would be reduced by 1/3rd. **If either of the present owners sell their interest you would receive 5% of the net selling price.** (Emphasis Added).

5. As President of the total company, your duties and responsibilities are to increase the value of the company by providing leadership and creativity necessary to expand the revenue stream. You have already reduced costs to a minimum so the only way to enhance the value of the company is to increase revenue, vis-a-vis slots, O.T. parlors in St. Landry, St. Martinville, Port Allen etc.

6. Note that although the expenses incurred in obtaining the slot parlor are not deducted against net income now, they will be deducted at such time as net income is received from slots.

4

Charlie we would not give this kind of package to anyone else except you and we are only giving you an opportunity to share in the value you create for the company. You are going to be a full charge president. You as President are going to be involved in all activities including negotiations, if any, for the sale of the company, long term financing, choosing new locations, building the new track or O.T. parlors, management staffing, equipment selection, and all other duties of president. We will give you all the staff support you request and we are available to assist you in any manner you choose. You will not be terminated for any reasons other than incapacitation, gross lack of performance, suitability or fraudulent activities.

I believe the foregoing covers the points we discussed last week. Please read the agreement and if you have any questions or additions, call me.

We have read the foregoing and agree to the terms and conditions of said agreement.

There is then a single blank line with the names "Charles B. Ashy, Sr.," "B.I. Moody III," "W.E. Trotter, II," and "Kevin Moody, Sr." underneath it, which was never signed by any of the parties.

Another document entitled "MEETING OF DECEMBER 30, 1997 BETWEEN B.I. MOODY & CHARLES ASHY, SR." reads as follows:[1]

PROPOSED BENEFIT PACKAGE:

1.  SALARY OF $100,000 EFFECTIVE JANUARY 1, 1997
    BONUS AS FOLLOWS:
    10% OF NET INCOME ADJUSTED TO ACTUAL INTEREST EXPENSE EXCLUDING JAM FEST, BUT NOT LESS THAN $50,000.

    EXAMPLE:
    NET INCOME        $1,700,000
    BONUS:            10%
    LESS: SALARY      $ ($100,000)
    BONUS AMOUNT      $70,000

---

[1] Ashy later testifies that this document was produced by Moody at the alleged January meeting in which Trotter, Moody, and Ashy were present.

2. SALARY OF $150,000 EFFECTIVE JANUARY 1, 1998
BONUS AS FOLLOWS:
10% OF PRETAX NET INCOME ADJUSTED TO
ACTUAL INTEREST EXPENSE

3. SALARY OF $300,000 PLUS BENEFITS EFFECTIVE
UPON THE OPENING OF THE SLOT OPERATIONS.
BONUS AS FOLLOWS:
5% OF NET INCOME (NET INCOME DEFINED AS
PER GAP)

EXAMPLE:
NET INCOME          $20,000,000
BONUS: 5%           $1,000,000
LESS: SALARY        $(300,000)
BONUS AMOUNT        $700,000

4. IF COMPANY IS SOLD YOU WILL RECEIVE 5% OF
NET SELLING PRICE.  EXAMPLE AS FOLLOWS:

SELLING PRICE       $50,000,000
BONUS: 5%           $2,500,000

5. IF ONE-THIRD INTEREST IS SOLD, YOU WILL
RECEIVE $700,000 AND PAY PACKAGE WILL BE
REDUCED BY 1/3 SALARY.

NOTE:     IF A MEETING OF MINDS IS REACHED, THIS WILL
BE REDUCE [sic] TO A WRITTEN AGREEMENT.

Trotter testified that he first bought the track, which he co-owned with Moody, in the late 1960's, for 2.2 million dollars.  He testified that he first met Ashy around this time.  Trotter stated that he had no connection with the day-to-day operation of the track.  He stated that he and Moody sold the track in 1982, for 12.4 million dollars.  Ashy had been the general manager for the four years prior to the 1982 sale.  Trotter testified that in 1992, Moody called him (Trotter was living in California at the time) about buying the promissory note on the track, which they did.  They intended to resell the note quickly for a profit.  However, in 1994, the track

stopped making payments on the note.

Trotter testified that Ashy took over the track in January 1995. He further testified that he and Moody agreed that Moody would handle approaching Ashy regarding returning to the track. Trotter stated he had no involvement other than to tell Moody that it was fine to hire him back. He further stated that, at this time, he and Ashy were friends and that Ashy often would buy and sell horses for him.

Trotter testified that, at first, Ashy did not want to return to the track, but that he agreed to come back for a short term in order to train someone to fill his position. However, that did not work out and Ashy was asked to stay. Trotter further testified that he did not conduct negotiations with Ashy; Moody handled all negotiations as the general managing partner of the track.

Trotter was then questioned as to negotiations that occurred in letters between Ashy and Moody beginning in April 1997, for his continued employment with the track. Trotter testified that he never saw, nor was he made aware of the April 1997 letter, the April 22, 1997 letter, or Ashy's September 15, 1997 resignation letter, which Ashy testified was delivered in person to Trotter's office.[2] Trotter further testified that he never saw the response letter authored by Moody, dated September 22, 1997, which has handwritten at the top of the letter "Kev. Copy to Billy [Trotter], review and comment. B.I." Trotter further denied seeing the December 30, 1997 Memorandum.

_____

[2]Numerous documents pertaining to Ashy's compensation package, leading up to the January 10, 1998 letter are not reprinted here.

Trotter testified that he did not recall Ashy's proposed salary increase to $100,000, plus ten percent of net income beginning January 1998, ever being discussed with him. He further did not recall any discussions regarding a salary of $300,000 plus benefits, or any discussions wherein Ashy would receive a net percentage of the selling price of the track if it were ever sold. He testified that he was never at any meeting in which the January 10, 1998 document was discussed nor had he ever seen the January 10, 1998 document before the trial began. Trotter went on to testify that he never saw a March 4, 1998 letter written by Moody and addressed to "Billy [Trotter] and Kevin" nor did he recall receiving or reading the March 5, 1998 letter written by Moody and addressed to Ashy, which has a copy sent notation at the bottom stating: "cc Kevin and Billy [Trotter]." In sum, Trotter testified that he never saw any documents pertaining to the 5% cut of the net selling price, never had any discussion with anyone pertaining to the 5% cut, and never knew anything whatsoever pertaining to the 5% cut allegedly promised to Ashy. He stated that Moody only had authority to obligate the company and not his equity interest in the business.

Moody testified regarding his and Trotter's ownership history of the track. He also testified that he and Ashy are good friends and that Ashy has worked at the track for thirty-four years. He further stated he knew that Ashy treated him as a "father figure." Moody testified that Ashy did a good job as general manager and successfully ran the track.

Moody stated that in 1992 or 1993, he and Trotter bought the note on the track. Moody testified that the loan proceeds from the December 2, 1992 note were

8

deposited in an account called the "Moody/Trotter Investment Account," with 50 % interest being his and the other 50% belonging to Trotter. Moody testified that he put his 50% portion into BIM3 Partnership, which eventually became 50% owner of the track. Moody went on to state that the owners were unable to make payments on the note and the track went into bankruptcy, which closed on December 5, 1994. It was then that Moody and Trotter assumed the liability to pay on the note. It was at this time that Ashy was brought back in to run the track at a profit so that Moody and Trotter personally would not be responsible for the note. He testified that Ashy returned reluctantly and worked the year without pay. However, he stated that at the end of the year he was given $100,000 for all the work he had done.

Moody testified that Ashy was responsible for the day-to-day operations of the track while he and his son, Richard Kevin Moody, Sr. (Kevin), handled the financial end of the business. Moody then testified as to documented correspondence between himself and Ashy. He testified that he did not recall a meeting between himself, Ashy, and Trotter in which the 5% net sales price compensation was discussed, but that he would not deny it if Ashy testified that it occurred. His testimony reveals that there is no doubt that he and Ashy had come to an agreement regarding the 5% net sales price bonus. Ashy had inquired several times regarding getting the document signed and Moody replied in a May 27, 1998 letter to Ashy:

> The sudden urgency in wanting to get the paper signed is puzzling to me. I told you what your pay package was and reduced it to writing because you asked and I agreed that it should be set forth in writing so everybody understood what our plan was for you. It is not a management contract but details what we want you to make in salary, bonuses and participation in future equity sales, if any. When I tell you something, you don't need it in writing. My word is better than any piece of paper but I wanted to make sure that you understood what you

9

had to do to add value to the company.

In fact, Moody testified that this was the last written correspondence pertaining to the compensation package. At the bottom of this letter was a handwritten note by Moody stating, "Son, I got more problems than you and I've got a hundred things to do—unlike you who only has to run the track!" According to Moody, this referred to some medical problems he was having at the time and inferred that the he did not want to be bothered further about getting the document signed.

Moody further testified that he sold his half of the track to Peninsula Gaming for fifteen million dollars in February 2002. He testified that following the sale, he took Ashy and his wife out to eat and personally gave him a $500,000 "bonus" for his thirty-four years of service at the track. He testified that the payment was paid solely in his individual capacity and not on behalf of the any other owner of the track. He also stated that he and Trotter retained the land on which the track sits and sold only the company. On cross-examination, Moody testified that he never told Ashy that Trotter agreed to pay him 5% of the net proceeds from the sale of his half of the track. Moody testified that all pay and bonuses were paid by the company, OED (the track), which was owned by BIM3 and Trotter Family LLC, with the managing member of OED being BIM3, managed by himself and his son Kevin. Moody testified that he had authority to negotiate compensation plans, but that it was beyond the scope of his authority to obligate Trotter's ownership in the company.

Moody went on to testify that he never had the opportunity to talk with Trotter "after the letter outlining what I would do," referred to giving Ashy 5% interest in the track. However, he did testify that for the thirty-four years of his

10

employment, Ashy always discussed all compensation issues with him, not Trotter, and that Trotter never indicated any interest in being active in handling these issues.

Michael Luzich, President of Peninsula Gaming Co., testified via deposition. He discussed his acquisition of Moody's half interest in the track and the agreements that he and Trotter had. Luzich testified that Trotter agreed to sign "going forward agreements" pertaining to his partnership in the track, but that he refused to sign them and was actively searching for a buyer for his half of the track. Luzich testified that he considered Trotter's action to be a breach of the commitment he had made to Peninsula Gaming and that it eventually sued Trotter for breach of contract. Following the lawsuit, Peninsula Gaming came to an agreement with Trotter whereby they bought out his interest, but agreed to give him a percentage of possible future slot machine revenues from the property as additional consideration.

Luzich testified that Ashy stayed on once Peninsula took over in order to train new people to run the track. He stated that he had no knowledge regarding the 5% of the net sale proceeds agreement nor had he ever seen any documents relating to it. Luzich further testified that Trotter never mentioned in their negotiations that a portion of the proceeds of the sale was obligated to Ashy. However, he testified that Moody did tell him that he was going to pay Ashy some monies out of the $15 million dollar purchase price paid to him. Luzich stated that Moody characterized it as "payment based on a sale," but that he did not remember any direct percentage amounts.

Luzich further stated he was unaware of any obligation that Trotter had to pay Ashy out of the sale price Peninsula Gaming paid to him. He also testified that

Ashy had nothing to do with the sale of Trotter's interest in the track to Peninsula Gaming and, in fact, had separated from the company when the deal was finalized. However, he went on to testify that he had no knowledge whatsoever of any other obligations or negotiations made between Trotter, Moody, and Ashy.

Hank Perret, Moody's attorney for approximately twenty years, testified at length regarding the financing of the track and the various legal instruments that were used in order to facilitate financing of the debt. Perret also testified that Ashy and Moody were very close friends. He further stated that, in the course of their business dealings, Moody often solely endorsed notes whose proceeds were for both he and Trotter. Perret described it as a relationship wherein Moody would call the bank and say "I want so much money for Billy [Trotter] and me. Billy will put "X" as collateral. I'll put "Y" as collateral. Send me a check." And then only Moody would pledge an asset to the bank which was an asset of both himself and Trotter.

Kevin, the managing partner of BIM3 Investments, testified that he has been the managing partner since approximately 1982. He testified he has known Ashy since before that time and that Ashy and his father were good friends. Kevin testified that Ashy's compensation package would have been primarily handled by his father.

Ashy testified that he began working at the track in 1966, and went through the history of how he came to work at the track the two separate times. He testified that in all that time he always negotiated with Moody regarding his compensation package. He stated that he never discussed pay issues with Trotter. Ashy testified that the two documents reprinted above were the ones Moody

12

presented to him and Trotter at the January meeting.  When questioned as to that and whether Moody asked Trotter for any comments at the meeting, Ashy testified:

> Yes, he asked me[.]  I agreed.  He said, "You agree to that?" I said, "Yeah." He asked Billy [Trotter], he said, "Do you agree? You got any – You agree to it? You got any comments on it," and he made one. "Yeah, why don't we get  – I don't understand why we didn't give Charlie more."  That was the only comment Billy Trotter made.

Ashy testified that he never had another meeting or conversation with Trotter after the meeting about this document.  He stated that Moody told him he would get the document prepared in an official form and have it signed and send it to him.  Ashy went on to testify that he did not feel like he had to have the document, but that he would have preferred to have it signed so no one would forget what was said.

Ashy testified that he mentioned to Moody several times that he would like to have the document signed and forwarded to him.  A handwritten note on the January 10, 1998 letter written by Moody stated, "I have redone this so many times I'm not sure I have covered all the points.  Please read it and let me know if it is ready to be signed. B. 3."  Ashy testified that he told Moody on numerous occasions that he was ready to sign the document.  A May 8, 1998 fax cover sheet sent by Ashy to Moody stated: "This agreement meets with my approval.  Please sign and have Kevin + Billy sign + return to me at your earliest convenience."  The following letter written and signed by Ashy was then submitted into evidence:

DATE:       MAY 25, 1998

TO:           MR. B.I. MOODY

FROM:      CHARLES B. ASHY, SR.

B.I.,
     ON  MAY  8,  1998,  I  FAXED  YOU  A  COPY  OF  OUR

13

AGREEMENT AND ASKED YOU TO SIGN IT AND RETURN IT TO ME. WHEN WE MET THE OTHER DAY AT THE FARM, I ASKED YOU AGAIN, YOU SAID YOU WOULD PULL IT AND SEND IT TO ME. WE SPOKE LAST WEEK, I ASKED YOU TO SIGN THE AGREEMENT AND SEND IT TO ME BEFORE THE END OF THE WEEK. I HAVE NOT RECEIVED IT YET.

I WOULD LIKE TO GET THIS OVER WITH, SO I AM ASKING YOU TO SIGN THE AGREEMENT THAT WE ALL AGREE ON AND FAX IT BACK TO ME TODAY.

Ashy testified that this was followed by Moody's May 27, 1998 letter referenced above, in which he states, "My word is better than any piece of paper." Ashy testified that once he received this document, he believed he did not need the signed document and that Moody's word was enough to guarantee the compensation package. Ashy went on to testify that, at that time, he did not know what Moody's comment ("I have more problems than you.") was referring to, but that after he asked Kevin, he was informed that Moody had cancer. Ashy testified that if he had known that from the beginning, he would not have bothered Moody about signing the documents.

Ashy went on to testify that he continued to work at the track until March 31, 2002, when Moody sold his interest. He stated that following his retirement, Moody took him and his wife out to dinner at which time he presented him with a check for $500,000, as well as a letter dated April 3, 2002, which stated in pertinent part: "In accordance with our agreement (which you never signed), I am enclosing a check for $500,000 as a bonus for a job well done."

Ashy further testified that Trotter stated that, at the time, he intended to continue with the track, but that he found out a few months later that he was trying to sell it to the Coushatta Indian Tribe in Kinder, Louisiana. Ashy stated that Trotter has never talked to him about anything regarding his sale of the track.

14

On cross examination, Ashy was questioned as to whether he had any proof that the January meeting between he, Trotter, and Moody took place. He responded that he only had his word and the two documents (the January 10, 1998 letter and the December 30, 1997 Memorandum) that Moody gave him at the meeting.

## ORAL CONTRACT AND APPARENT AUTHORITY

Louisiana Civil Code Article 1927 states:

A contract is formed by the consent of the parties established through offer and acceptance.

Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent.

Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.

Louisiana Civil Code Article 1846 states:

When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.

If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.

It is widely held that only general corroboration must be shown; independent proof of every detail is not needed. *See Taylor v. Dowden*, 563 So.2d 1294 (La.App. 3 Cir.), *writ denied*, 568 So.2d 1057 (La.1990); *Peter Vicari Gen. Contractor, Inc.,* 831 So.2d 296.

After reviewing all of the evidence, we do not find the jury erred in finding that an oral contract existed between Trotter and Ashy whereby Trotter agreed

15

pay him 5% of the net sales price of his portion of the track, or $750,000. Although the jury was not asked to specify the basis upon which it found a contract to exist, we must infer that it found a contract was confected at the January meeting since it found Trotter personally liable in his individual capacity. While the evidence is overwhelming that Moody had apparent authority to bind the corporation, he did not have the authority to bind Trotter personally.

This case centers around assessing the credibility of the witnesses—a task that a jury is in a far better position to undertake than we are as a court of appeal. Essentially, Ashy testified that the meeting occurred, Trotter testified that it did not, and Moody testified that he did not remember it occurring, but that he would not deny it if Ashy said it did. Ashy also produced documentary evidence (the January 10, 1998 letter and the December 30, 1997 Memorandum), which he testified Moody brought to the January meeting.

This evidence is sufficient for finding that an oral contract exists, and the jury cannot be manifestly erroneous in weighing credibility determinations. Moreover, it was not unreasonable for the jury to discount Trotter's testimony considering the volumes of paperwork in which it was notated that he was sent a copy that he claims never to have seen. The jury could have reasonably concluded that Trotter was aware of the proposed 5% cut since it was over a five year period between when the January 10, 1998 document was executed and the 2002 sale of his interest in the track in 2002.

Trotter also argues that La.Civ.Code art. 1947 requires that a written contract be formed and, since none was, none are bound. Article 1947 states: "When

in the absence of a legal requirement, the parties have contemplated a certain form, it is presumed that they do not intend to be bound until the contract is executed in that form." He bases his argument on the "If a meeting of the minds is reached this will be reduce [sic] to a written agreement," notation at the end of the Meeting of December 30, 1997 memorandum and the numerous requests by Ashy that the January 10, 1998 letter be signed. However, the jury could reasonably infer that once Moody sent the letter stating that his word is better than any writing, and based on the oral agreements made during the January meeting, the need for a written document was obviated. Moreover, if Trotter claims that he has never seen any of these documents whatsoever, surely he cannot now claim he contemplated this particular form. While Moody and Ashy may have contemplated a signed written agreement at one time, the jury could reasonably infer that once Moody made the statement that his word was better than any signed document, the parties no longer contemplated a written agreement. Furthermore, since Trotter's personal liability does not hinge on Moody's apparent authority, this argument fails.

Accordingly, we find no error in the jury's finding that a contract existed between Ashy and Trotter and this assignment of error is without merit.

## EXPERT WITNESS

Ashy argues that the trial court erred in failing to accept Steven A. Molnair as an expert in the projection of future slot revenues. Louisiana Code of Evidence Article 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or

17

otherwise.

On appeal, we will not disturb the trial court's vast discretion in determining the admissibility of expert testimony unless it is clearly erroneous. *See Mistich v. Volkswagen of Germany, Inc.,* 95-0939 (La. 1/29/96), 666 So.2d 1073.

We have adopted the standards set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993), which regulate the admission of "scientific" testimony. In that case, the Supreme Court stated that the gatekeeping function of the trial court requires it to assess, among other things, the "reliability" of the methodology or formulation upon which the expert's opinion is based. The reliability of a non-scientist expert's testimony, when it is not formulated on scientific research, is still judged using the *Daubert* standard. The Supreme Court has recognized such in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999). We have also recognized this rule in *Darbonne v. Wal-Mart Stores, Inc.,* 00-551 (La.App. 3 Cir. 11/2/00), 774 So.2d 1022. Thus, the trial court's gatekeeping obligation applies to testimony based on "technical" and "specialized" knowledge. *Id.* In *Kumho,* 526 U.S. at 141-42, 119 S.Ct. at 1171, the Supreme Court stated:

> [T]he test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

The trial court's inquiry must be tied to the specific facts of the particular case. *Id.* The abuse of discretion standard applies to the trial court's ultimate conclusion as to whether to exclude expert witness testimony and to the trial court's

decisions as to how to determine reliability. *Id.*

Molnair, a consultant in the racing industry, testified that he works with potential buyers in acquiring casinos. He stated that he met with Moody approximately ten times over the period of August 1999 through April 2001, bringing three prospective buyers to the table. He stated that he was introduced to Moody by Ashy. Ashy's counsel attempted to introduce Molnair as an expert in the field of "projection of revenue streams for slot revenues," however, the trial court refused to accept him as an expert because he had no accounting or economics background that would qualify him as an expert in projecting revenue streams. Ashy's counsel strenuously argued that his experience in the industry should suffice to qualify Molnair as an expert. The trial court disagreed and did not accept him an as expert.

Having reviewed the testimony, we find the trial court did not err in excluding Molnair's testimony based on a lack of education and training in the financial field. Molnair has a degree in theology and worked as a minister for seven years. He then worked at IBM as a manager for twenty years. Thereafter, he worked at a company that produced software for racetrack computer systems and six years with another internet company. Since August 2001, he has been self-employed working for individuals involved in the business of rotational signs in ballparks. He has never testified nor been tendered as an expert in the field of slot revenue projections. We conclude that the trial court did not abuse its vast discretion in finding that Molnair did not have adequate training or education in order to determine future slot revenues.

19

Moreover, we do not think his testimony, if allowed, would have assisted the trier of fact in understanding "a fact in issue." In line with Ashy's second assignment of error, he argues that the "5% of net selling price" should have included 5% of future slot revenues that Trotter will receive based on his agreements with Peninsula Gaming.[3] We disagree. Based on the plain wording of the contract, we do not find that the jury erred in failing to project possible future slot revenues in the "5% of net sales price." The jury was free to determine any amount it felt Ashy was owed under the contract and the $750,000 award is exactly 5% of the net sales price of $15 million to Peninsula Gaming. The jury could have concluded that the contract could have stated that an additional percentage would be given for either actual or projected slot revenues, but it did not. Thus, we find no error in the trial court's refusal to allow Molnair's testimony or the jury's failure to award damages based on future slot revenues. These assignments of error are without merit.

### BUILDING AND PROPERTY

Similarly, Ashy argues that he should have received an additional $150,000 or 5% of the net selling price of $3 million for Trotter's interest in the land and the buildings at Evangeline Downs. Again, the jury could have properly found that the contract whereby either of the present owners "sell their interest [in the company] you would receive 5% of the net selling price," meant only Trotter's half of OED and not his or Moody's ownership of the underlying land and buildings. The overall testimony of Ashy himself suggests that this was the understanding. Thus,

---

[3] Numerous witnesses testified as to Ashy's involvement in having the slot bill passed in the legislature and whether this was part of his role as the President of the track or outside of his job duties.

20

this assignment of error is without merit.

## INTEREST

Finally, Ashy argues that he should have been awarded interest from the date of the breach of contract, rather than the date of judicial demand, citing La.Civ.Code art. 1989, which states: "Damages for delay in the performance of an obligation are owed from the time the obligor is put in default. Other damages are owed from the time the obligor has failed to perform."

However, La.R.S. 13:4203 states that legal interest shall attach from date of judicial demand in tort cases. While it is generally true that judicial interest should accumulate from the date of breach in contract cases, as opposed to the date of judicial demand, the supreme court in *Trans-Global Alloy Limited v. First National Bank of Jefferson Parish*, 583 So.2d 443 (La.1991), has held that in "highly complicated" cases where the issues are whether a breach has occurred and the appropriate damage amount, it is appropriate to award interest from the date of judicial demand. We find this case falls into the "highly complicated" category. It involves issues of whether a contract even existed and to what extent the contract terms extended. Thus, we find no error in the trial court's award of legal interest from the date of judicial demand. This assignment of error is without merit.

## CONCLUSION

The judgment in favor of the plaintiff-appellee/appellant, Charles B. Ashy, is affirmed. All costs of this appeal are assessed against the defendant-appellant, William E. Trotter, II and William E. Trotter, II Family LLC.

**AFFIRMED.**

21