# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-1056

HALL PONDEROSA, LLC

VERSUS

PETROHAWK PROPERTIES, L.P.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2009-3560
HONORABLE WILFORD D. CARTER, DISTRICT JUDGE

**********

**PHYLLIS M. KEATY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Phyllis M. Keaty, Judges.

**REVERSED AND RENDERED.**

Kenneth Michael Wright
Attorney at Law
203 West Clarence Street
Lake Charles, Louisiana  70601
(337) 439-6930
Counsel for Plaintiff/Appellee:
        Hall Ponderosa, LLC

Jamie S. Manuel
Mayhall & Blaize, L.L.C.
5800 One Perkins Place Drive, Suite 2-B
Baton Rouge, LA 70808
(225) 810-4998
Counsel for Defendant/Appellant:
        Petrohawk Properties, L.P.

**KEATY, Judge.**

In this action for reformation of a lease, the managers of Hall Ponderosa, LLC, asserted that an entire section of property owned by Hall Ponderosa was inadvertently left out of the lease agreement. Claiming mutual error, Hall Ponderosa sought to have the lease reformed to include that section of property and sought payment for that section's acreage at the rate of bonuses, $15,000 per acre.[1] After a bench trial on the merits, the trial court found that Hall Ponderosa had met its burden of proving, by clear and convincing evidence, that mutual error existed. The trial court then ordered reformation of the lease to include the additional section and ordered Petrohawk Properties, L.P., to pay $15,000 per additional acre. After carefully reviewing the record, we find no evidence of proof, by clear and convincing evidence, that mutual error occurred. We further find that Hall Ponderosa was negligent in executing the lease agreement and cannot now seek to reform the lease. For the following reasons, we reverse the trial court's judgment and render judgment in favor of Petrohawk Properties.

## Facts and Procedural History

The basis for this case is a mineral lease executed between Hall Ponderosa and Petrohawk Properties. Hall Ponderosa is owned by descendants of Wallace Alford Hall and Frances Tipton Hall and was created so that property owned by the Hall descendants could be managed more effectively. Hall Ponderosa owns two pieces of property in Red River Parish that are subjects of the instant litigation. One tract is in Section 14 and is known as Stella Plantation, and the other is located in Section 13 and is known as the Town Dump. The properties are separated by a natural boundary, the Bayou Coushatta. These properties were contributed to Hall

---

[1] $15,000 per acre is the amount Hall Ponderosa was paid for the property included in the lease agreement.

Ponderosa on June 26, 2008, the day before the lease in question was signed.[2] At the time that the lease was signed, no one knew the exact size of either tract of land, but the managers of Hall Ponderosa believed that the Section 14 tract was about 170 acres and that the Section 13 tract was about thirty acres. Although the actual acreage of the tracts of land was unknown, the property descriptions for both tracts were available at the time the lease was signed and could have been included in the lease without a survey on the properties. Two of Hall Ponderosa's managers, Tommy Wright and Greg Hall, were responsible for the lease with Petrohawk.[3] Wright is an experienced landman, and Hall is a petroleum engineer with experience in oil and gas exploration.

Petrohawk leased certain mineral rights in the Section 14 property owned by Hall Ponderosa. Shortly before the lease was executed, in early summer 2008, Petrohawk was involved in a "land rush" to acquire oil and gas leases in areas that might be within the Haynesville Shale region. Exploration had not progressed far enough along for anyone to know where exactly the Shale region was located. Initially, landmen were encouraged to acquire leases in a large area, including Red River Parish, Louisiana. As exploration progressed, the areas Petrohawk was interested in leasing became more defined.

At that time, Petrohawk contracted with thirteen firms that employed many landmen. One of the firms they contracted with was Cornay-Lowrey, which in turn employed Jeff Heard, one of many landmen working to acquire oil and gas

---

[2] The lease states that it was signed on June 25, 2008, but testimony indicates that the lease was actually signed on June 27, 2008.

The original contribution of real estate contained property descriptions for two pieces of property, Section 13 and Section 14. The property description for the Section 13 property was inaccurate and was later corrected to reflect its actual location.

[3] Tommy Wright and Greg Hall were the only two managers of Hall Ponderosa involved in the lease negotiations with Petrohawk. For purposes of this opinion, they are referred to as Wright and Hall.

leases for Petrohawk. Heard was the individual responsible for acquiring and negotiating the lease with Hall Ponderosa on behalf of Petrohawk.

Petrohawk employed a database manager to send blanket mail-outs to land owners on the tax rolls of parishes in the areas of interest. These mail-outs stated that Petrohawk was doing some oil and gas exploration in the area and might be interested in leasing the landowner's property.

Wright's mother, one of the Hall descendants, received two mail-outs, one for each tract of land she co-owned in Red River Parish. Shortly thereafter, on June 10, 2008, Heard contacted Wright's mother by telephone. Wright spoke with Heard who indicated Petrohawk was interested in obtaining an oil and gas lease on the Hall property.

Wright relayed that conversation to his cousin, Hall. Hall then emailed a friend, who owned an oil and gas company, and explained that they owned two pieces of property totaling about 200 acres that were available for lease. The cousins were also in negotiations with Pride Energy as late as June 25, 2008, and, ultimately, ended negotiations because the details of that lease could not be agreed upon by the parties.[4]

Heard testified that he ignored all property in Section 13 because it was near the town of Coushatta, it was hard to find large pieces of property in populated areas, and Petrohawk generally only wanted to lease property that was about 100 acres or more. He also testified that he knew that Section 13 was on the edge of the area of interest. Instead, Heard focused his attentions on Section 14, particularly Stella Plantation, which was about 170 acres according to old leases.

---

[4] Wright initially testified that he ended negotiations with Pride because they signed a lease with Petrohawk; however, his deposition and his answers later in his trial testimony indicate that the reason he stopped negotiating with Pride was because the parties could not come to an agreement concerning the lease terms.

After Heard's telephone conversation with Wright, the two began negotiating a lease with input from Hall. All parties testified that the lease was executed quickly. The initial telephone conversation occurred on June 10, 2008, and the lease was executed on June 25, 2008. Wright made sure that the lease contained a competing nations clause and a provision that the bonus would not have to be returned even if the property totaled less than 170 acres once surveyed. Hall relied on Wright's expertise as a landman in drafting the leases. The property description attached as Exhibit A to the lease was the exact property description included in the previous leases of Stella Plantation, which was provided to Heard by Wright for use in the instant lease.

Neither Wright nor Hall specifically stated to Heard that they owned the Section 13 property, and it needed to be included in the lease. Heard testified that he was not aware that they owned any property in Section 13; he only knew about and was only interested in the Stella Plantation. At the time that the parties were negotiating, the two properties had not been contributed to Hall Ponderosa. That contribution was not final until the day before the lease was signed, and Heard was not made aware of Section 13's inclusion in the Hall Ponderosa contribution or of Hall Ponderosa's intent to lease both pieces of property.

Wright saw the lease and the property description at issue, which only described the Section 14 tract, on the day the lease was signed. Hall testified that he did not receive a copy of the lease but that Wright told him it was acceptable to sign. Section 13 was not included in either document. Because the lease was executed so quickly, it contained some errors that needed to be cleaned up, and Heard said he would take care of them. Wright, Hall, and Heard then exchanged several emails in early July concerning the cleanup of the lease. Section 13 was not mentioned. In his final email to Wright containing the cleaned-up lease and

4

signature pages, Heard outlined all of the changes he made to the lease. Again, Section 13 was not mentioned.

Hall Ponderosa then had its property surveyed. The surveyor determined that because of accretion, the Section 14 property was actually about 156.87 acres, and the Section 13 property was 144.55 acres. In November 2008, Wright contacted Heard and stated that they had unleased property in Section 13 on which they expected to receive lease offers. He asked Heard if Petrohawk was interested in leasing that property. Heard declined. In March 2009, Hall Ponderosa sent a letter to Petrohawk stating that the Section 13 property had mistakenly been left off of the lease, that the lease needed to be reformed to reflect the properties owned by Hall Ponderosa, and that they were entitled to the same bonus paid for the Section 14 property, $15,000 per acre. Petrohawk replied that they were mistaken.

Hall Ponderosa then filed the instant lawsuit making the same allegations: that they intended to lease their entire property to one entity, that Section 13 was not included in the lease, that the lease needed to be reformed to include Section 13, and remuneration for the additional acreage was owed. The trial court found that Hall Ponderosa met its burden in proving there had been a mutual error in the construction of the lease and that each party meant to lease all of Hall Ponderosa's property. Based on its finding of mutual error, the trial court ordered that the lease be reformed to include the Section 13 property, an additional 144 acres, and that Petrohawk pay nearly two million dollars to Hall Ponderosa as remuneration. It also found that Petrohawk was liable for attorney fees and costs. Petrohawk filed a motion for new trial, after which the trial court amended its judgment concerning the amount of judicial interest owed and the date interest began accruing. Petrohawk appealed, and Hall Ponderosa answered the appeal.

5

**Issues**

Petrohawk avers that the trial court was erroneous in finding that Hall Ponderosa met its burden of proof, thereby warranting a finding of mutual error. It also asserts that the trial court erroneously cast them with attorney fees and costs after misinterpreting paragraph twenty-five of the lease. In its answer to the appeal, Hall Ponderosa prays that the trial court's judgment be affirmed, that the language concerning legal interest be amended to that in the original April 18, 2011 judgment, and that they be awarded attorney fees for additional work done on appeal.

**Standard of Review**

Appellate courts employ the manifest error/clearly wrong standard to review judgments that determine whether mutual error existed in a contract because a finding of mutual error is essentially a finding of fact. Likewise, attorney fees and the date on which judicial interest begins to accrue are also subject to the manifest error standard of review. *See Thibodeaux v. L. S. Womack, Inc.*, 94-1375 (La.App. 3 Cir. 4/5/95), 653 So.2d 123, and *Ashy v. Trotter*, 04-612 (La.App. 3 Cir. 11/10/04), 888 So.2d 344, *writs denied*, 05-180 (La. 3/24/05), 896 So.2d 1045 and 05-347 (La. 3/24/05), 896 So.2d 1047.

The supreme court provided guidance to courts of appeal on the application of the manifest error standard of review in *Stobart v. State through Department of Transportation and Development*, 617 So.2d 880 (La.1993). In this case, it reiterated a two-part test that must be met before a trial court's finding of fact can be reversed:

> 1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

> 2) The appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

> *See Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987).

> This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. *Id*. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.

*Id*. at 882.

It is not an appellate court's duty to determine whether the fact finder was correct. Rather, it is the duty of the appellate court to determine whether the findings were reasonable. *Id*.

### Discussion

Hall Ponderosa filed suit to reform an oil and gas lease to include a tract of land not contained in the original lease and to obtain bonus payments of $15,000 per acre on the additional property. After a two-day trial, the trial court found that there were two mutual errors: the omission of Section 13 and the belief that the Hall Ponderosa property was 170 acres. The trial court reformed the lease to include the Section 13 property description and ordered that Petrohawk issue payment in remuneration for 131.42 acres at $15,000 an acre, totaling $1,971,300.[5]

Generally, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046. If the words of a contract are clear, explicit, and lead to no absurd results, it must be interpreted by reference to the "four corners" of the document and no further interpretation can occur in search of the parties' intent. *Hebert v. Ins. Ctr., Inc.*, 97-298 (La.App. 3 Cir. 1/7/98), 706

---

[5] This figure was computed by the trial court by subtracting 170 acres from the total acreage owned by Hall Ponderosa and multiplying that amount by $15,000.

So.2d 1007, *writ denied*, 716 So.2d 888, 98-353 (La. 3/27/98). Law and jurisprudence provide that courts are bound to give legal intent to contracts according to parties' true intent, which must be determined by the words of the contract when these are clear, explicit, and lead to no absurd consequences. *Ransom v. Camcraft, Inc.*, 580 So.2d 1073 (La.App. 4 Cir. 1991).

However, when contracts do not reflect the parties' true intents, "[r]eformation is an equitable remedy which is available to correct mistakes or errors in" those contracts. *Teche Realty & Inv. Co., Inc. v. Morrow*, 95-1473, p. 4 (La.App. 3 Cir. 4/17/96), 673 So.2d 1145, 1147. To succeed in a reformation action, the party seeking reformation must establish by clear and convincing evidence that mutual error and mistake occurred. *Id.*

> A mutual mistake is a mistake shared by both parties to the instrument at the time of reducing their agreement to writing, and the mistake is mutual if the contract has been written in terms which violate the understanding of both parties; that is, if it appears that both have done what neither intended.

*Id.* (quoting *Succession of Jones v. Jones*, 486 So.2d 1124, 1127 (La.App. 2 Cir.), *writ denied*, 489 So.2d 249 (La. 1986)). Reformation is only to be used "to correct mistakes or errors in the written instrument when such instrument, as written, does not express the true contract or agreement of the parties." *Brabham v. Harper*, 485 So.2d 231, 233 (La.App. 3 Cir. 1986). "The evidence of mutuality must relate to the time of the execution of the instrument and show that the parties then intended to say one thing and by mistake expressed another and different thing." *WMC Mortgage Corp. v. Weatherly*, 07-75, p. 4 (La.App. 3 Cir. 6/13/07), 963 So.2d 413, 416, *writ denied*, 07-1475 (La. 10/5/07), 964 So.2d 945 (quoting *Teche Realty*, 673 So.2d 1145).

Reformation "is a personal action, even when applied to real estate, in which the burden is on the one seeking reformation to establish the mutual error and mistake by clear and convincing proof." *Agurs v. Holt*, 232 La. 1026, 1032, 95 So.2d 644, 646 (La.1957). "Proof by clear and convincing evidence requires more than 'a preponderance of the evidence,' the traditional measure of persuasion, but less than 'beyond a reasonable doubt,' the stringent criminal standard." *Hines v. Williams*, 567 So.2d 1139, 1141 (La.App. 2 Cir.), *writ denied*, 571 So.2d 653 (La.1990). "To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence." *Id*. "[This] distinct standard, persuasion by clear and convincing evidence, is usually applied 'where there is thought to be special danger of deception, or where the court considers that the particular type of claim should be disfavored on policy grounds.'" *Id*. (quoting McCormick On Evidence, Section 340(6) (2d ed. 1972)). In Louisiana, the contract is presumed to be a true reflection of the parties' intent. Thus, reformation, which allows a party to amend portions of a contract, requires a higher burden of proof before it can be granted.

After carefully reviewing the record, we find that the trial court was manifestly erroneous in finding that Hall Ponderosa proved by clear and convincing evidence that it and Petrohawk intended to include the Section 13 property in the lease. We find that the record is void of a reasonable factual basis for the trial court's finding of mutual error.

Testimony by Hall supports a conclusion that the trial court's finding of mutual error was erroneous. Mutual error must "relate to the time of the execution of the instrument." *WMC Mortgage Corp.*, 963 So.2d 416. Hall testified that they (he and Wright, who signed the lease on behalf of Hall Ponderosa) were "satisfied

9

with the terms of the oil and gas lease." He further stated that they "were happy when the lease was signed." These statements defeat a suggestion that, at the time the lease was signed, they intended to lease the Section 13 property.

Even if we ignore the plaintiff's assertion that Hall Ponderosa was happy with the lease when it was signed, the trial court was still manifestly erroneous when it found mutual error between the parties. Hall Ponderosa had the burden of proving, by clear and convincing evidence, that Petrohawk intended to lease from Hall Ponderosa the Town Dump property located in Section 13. They failed to meet that burden.

Never, during their negotiations with Heard, did Hall or Wright mention owning property in Section 13. Although they told him they would be contributing all of their property to Hall Ponderosa before signing the lease, they never expressly mentioned that they wanted to lease all of their property to Petrohawk. The contribution of property was not completed until the day before the lease was signed. Heard testified that he did not even look at Section 13. Hall testified that the parties spent the majority of the time negotiating the terms of the lease and that there was little discussion concerning the property description because there was no question about title.

Wright, a landman who is experienced in negotiating oil and gas leases, testified that he made sure the lease included the specific term, delay rentals, drainage clause, warranty of title, and a favored nations clause. Wright sent a copy of a 1990 lease of the Stella Plantation, which he helped negotiate, to Heard on June 19, 2008, so that Heard could use it as the basis for the 2008 lease. Heard testified that Wright wanted the lease to reflect his (Wright's) form. There are emails between the two men corroborating that testimony. In those emails, Wright never mentioned including Section 13 in the lease and never sent a Section 13

10

property description to Heard to be included in the lease, though he did send the Section 14 property description. Although Hall knew Hall Ponderosa owned property in Sections 13 and 14 when the lease was created and although he testified that he wanted to lease all of Hall Ponderosa's property to one operator, he also testified that there was no specific conversation, email, or letter between him and Petrohawk that would indicate that Hall Ponderosa wanted the lease to include both Section 13 and Section 14.

After the original lease was signed, there were some small mistakes and omissions that needed to be "cleaned up." The parties emailed back and forth several times negotiating these changes. Ultimately, the second and final version of the lease was signed in early July, 2008. During those negotiations, the Section 13 property was not mentioned, despite Wright's testimony that he looked at the original lease and the property description before signing the instrument, and that he discussed the absence of Section 13 in the property description with Heard on the original signing date. Although Wright claims he told Heard the Section 13 property description was missing from the lease, he failed to mention it again until November 2008, despite negotiating other details with Heard subsequent to the alleged discussion of Section 13's exclusion from the lease.

Hall Ponderosa's contention that it intended to lease the Section 13 property did not arise until after they had their property surveyed and found out that Section 13 totaled 144.55 acres of land due to accretion from a river. At that time, Wright sent an email to Heard stating that they had "unleased property in Section 13," that they expected to receive lease offers on the acreage, and inquired about Petrohawk's interest in leasing the property. Wright testified that he used this language because he "isn't a lawyer," and he thought if it was not described, it was not leased. Although Wright is not a lawyer, he is a certified petroleum landman

with over thirty years in the oil and gas industry and has negotiated mineral leases as part of his primary job duties. When questioned about the email, he stated, "it says what it says." He also testified that what he intended to state, though did not, in his email was that the parties needed to conform the lease to include the Section 13 property. He failed to mention any agreement about amending the property description to include Section 13 and when questioned further, testified, "I said what I said, document speaks for itself." The email from Wright to Heard states, in pertinent part: "To follow up with our telephone conversation today, I wanted to let you know that Hall Ponderosa, LLC has unleased acreage in Sec. 13, T12N, R10W, Red River Parish, La[.] which is contiguous with the property we own in Sec. 14." The document further states, "I wanted to let you know of this information, as we expect to receive lease offers on this acreage…..Please feel free to contact me. Have a good Thanksgiving!!"

Although the trial court discredited all of defendant's testimony and greatly weighed the testimony of Hall and Wright, neither Hall nor Wright were able to give precise statements about their actions. Though they contend that they intended to lease all of the property to Petrohawk, they were unable to give clear answers for their failure to mention Section 13 during lease negotiations or to account for their choice of language in the November 2008 email in which they classified the Section 13 property as "unleased." Further, Hall testified that they entered into the lease because they "wanted the money." Finally, they were unable to explain why they waited until March 2009 to assert that the parties had agreed that Section 13 should be included in the lease, when they were aware of its exclusion in June 2008.

The trial court relies on Hall Ponderosa's aborted negotiations with Pride as part of its reasons for finding mutual error. Initially, Wright testified that

negotiations with Pride fell through because they had entered into a lease with Petrohawk, but in his deposition, he stated that the reason was because there was a problem with the lease terms. When questioned further at trial, Wright stated that an inability to agree to lease terms and language was one of the reasons they stopped negotiating with Pride. Tellingly, Wright testified, "[h]e [Heard] knows what he wants to lease" and "I know what I wanted to lease or our family wanted to lease." There is absolutely nothing in the record to indicate that Heard ever intended to lease the Section 13 property. In fact, he testified that he did not know they owned property in Section 13.

Hall Ponderosa did not offer any evidence that Petrohawk intended to lease their property in Section 13. There are no emails, letters, or other written communications to indicate that Petrohawk intended to lease both properties. Further, testimony from both parties indicates that there was never a discussion about specific property descriptions or that Hall Ponderosa intended to lease all of its property to Petrohawk. The only property description exchanged between the parties in connection with drafting the lease was that of the Stella Plantation in Section 14. Finally, the contribution of real estate, which is the only document exchanged that contains any reference to the Section 13 property, was not completed until the day before the lease was signed and after negotiations were complete. Even if Hall Ponderosa had stated that it wanted to lease its property to Heard, Heard, who was only working on the Section 14 property, would not have had any way of knowing what Hall Ponderosa meant by "all of its property" when drawing up the lease, as neither Wright nor Hall ever mentioned owning property in Section 13.

Finally, Hall testified that he did not read the lease before signing it. Wright testified that he signed the lease even though the property description for Section

13 was not attached. After the lease was signed, the parties negotiated "clean up" items. Section 13 was not mentioned. "The law of Louisiana is that one who signs an instrument without reading it has no complaint." *Capdeville v. White's Temple*, 99-1040, p. 2 (La.App. 3 Cir. 12/22/99), 755 So.2d 923, 925 (quoting *Tweedel v. Brasseaux*, 433 So.2d 133 (La.1983)). Although the law "does not compel people to read or to inform themselves of the contents of instruments which they may choose to sign, [. . .] it holds them to the consequences, in the same manner and to the same extent as though they had exercised those rights." *Id.* "[S]ignatures to obligations are not mere ornaments." *Id.* Further, "[a] party cannot rescind an instrument which he negligently executed." *Humble Oil & Refining Co. v. Chappuis*, 239 So.2d 400, 406 (La. App. 3 Cir.), *writ refused*, 256 La. 915, 240 So.2d 375 (La.1970) (in which Judge Miller dissents with the majority opinion). Both Wright and Hall signed the original lease and the cleaned-up version of the lease. This was negligence on their part. Hall should not have signed the lease without reading it. Wright should not have signed a lease that did not reflect Hall Ponderosa's intent. Wright's negligence in signing a lease that he knew did not conform to Hall Ponderosa's intent and Hall's negligence in failing to read the lease to which he affixed his name preclude them from seeking reformation of the lease due to error.

### Disposition

For these reasons we find that Hall Ponderosa failed to prove by clear and convincing evidence that mutual error existed in the lease contract. We reverse the trial court's judgment in its entirety. We deny Hall Ponderosa's request for attorney fees for work done on appeal. Accordingly, we need not address the remaining assignments of error. Costs are cast against Hall Ponderosa, LLC.

**REVERSED AND RENDERED.**

14